Case 23-3535, United States of America v. Fredrick Johnson. Argument not to exceed 15 minutes per side. Mr. Paulus, you may proceed for the appellant. Thank you, your honors, and may it please the court. My name is Andrew Paulus, and I have the privilege of being before you today to represent the appellant, Fredrick Johnson, in an appeal from his conviction for having possession of firearms as a felon. It is astounding to me how quickly the law regarding the Second Amendment has changed in just the short time since Mr. Johnson's trial, but I brought to your honors attention the Second Amendment decision, I think authored by Judge Lepar in the Williams case. And I know Judge Davis, that you were on that panel and had a slightly different take on the question. But to the extent that this court has decided that the right of every defendant charged with this sort of weapons violation to show, to make a showing, even if it's the defendant's burden, to make a showing that the defendant has no dangerous aspect to himself, has rehabilitated perhaps from whatever happened before, that to me is an intervening decision that this court must send back to the district court so that Mr. Johnson has that opportunity. Why is that? In Williams, as you know, we decided it in the first instance for Mr. Williams because he had category one, what we called category one crimes. Your client has an aggravated assault involving domestic violence where I think two teeth were missing, another assault, drug crimes which are admittedly category two, but nonetheless, why isn't that enough for us to conclude there's no possible way he can make this showing? Well, thank you, Judge Thapar, for that question because I've spent some time thinking about it. And I first want to correct a mistake in our reply brief where we indicated that the record reflected no prior violent crimes. It's interesting because the record, as we had that in mind when we submitted that brief, didn't include the pre-sentence investigation report. And I'll explain why in a moment. But the idea here is that the decision whether someone in Mr. Johnson's position is still dangerous, even when his last violent crime is almost ten years old, it'll be next month, I think, a ten year history, and has a long history of rehabilitation, including the time he has just completed serving in prison for this particular offense. It seems to me that for this court to deprive him of a chance to show that, as one of the ending footnotes in the Williams decision suggests. As we pointed out in Williams, doing it after the fact doesn't help you out as much. It'd be nice if you brought, look, he could go to district court now and say, can I get my Second Amendment rights? I'm skeptical he could based on the felon in possession charge plus everything that preceded it. But it seems like, to me, that you can consider all these crimes and say, look, this is a dangerous person. And I get the gap in time, but at some point, that's not going to preclude you. As Judge Davis pointed out, when he was doing this stuff, the backdrop wasn't even you could challenge. It's only in light of Bruin and Rahimi that you now can. So that's part of the problem, is the evolving nature of this area of the law. But the one aspect of this issue that I haven't yet mentioned that I think is really important is that the way that the Williams decision sets up this dynamic, it's as if the dangerousness determination or the absence of dangerousness is now an affirmative defense that the defendant can put forward to prove that the defendant should not be held liable for this particular violation. But can I ask you a question about that? Because I hear you talking about kind of information on the ground as opposed to just looking at the actual crime that was the subject of the prior conviction. And I think that as we've looked at it, and as all of the precedent has talked about it, it's talked about whether or not the prior crime that you were convicted of is one that makes one think that you might be dangerous. Are you suggesting that what the court should be doing is also looking at other factors on the ground, such as whether evaluating whether or not there has been some rehabilitation and things that are not, for instance, going to be found in the actual convictions that are on the record? Absolutely, Your Honor. And particularly... What's your, I guess, what's your authority for that? Well, there is no authority yet. In fact, this circuit is probably, to my knowledge, one of the few that has even departed from Your Honor's position in your concurring opinion in the Williams case. But it seems to me that the, I think it's the penultimate footnote in Williams, makes a reference to what these factors should be. We don't really know. We haven't explored them yet, right? This is a new decision. It wasn't even unanimous among the panel that decided it. And so we don't yet know, and the Supreme Court, of course, hasn't told us, what would constitute dangerousness. But to answer Your Honor's question, these crimes are so old that at least next month, when the first, when the last of them reaches its 10-year anniversary, that they wouldn't be even admissible to impeach Mr. Johnson at trial, were he to, unless he qualified for the exception to this day of conviction. What about the drug crime? Would that be enough to qualify for dangerousness? I personally don't think it should, Your Honor, especially considering the age of it and his testimony at trial about what he went through around those times. He had drug addictions. He has anxiety. He has depression. And he self-medicated. Yes, it's illegal. Yes, it's a crime. But it doesn't make him dangerous. And most of the- 2019, right? Drug possession, having weapons. Are we just ignoring that one? Well, that's not a crime of violence, Your Honor. It doesn't make it- Look, here's the thing. The law's only going to get worse for criminal defendants if this is the poster child, because here's the problem. You got assaults where he's assaulting loved ones. You have having weapons under disability where he's carrying a concealed weapon. You have other prior drug trafficking crimes. You add all that up, I mean, you really think you can prove you're not dangerous? This isn't someone that's obeying the law. He had a 2019 conviction when this conviction happened. So let me, if I may, Your Honor, a piece of this I haven't yet addressed. Is that that's a jury question. If, in fact, he has the right to defend himself by saying I am not dangerous, then by this court's taking that criminal history and that criminal history alone and making a conclusive finding that he is, is the equivalent of summary judgment which doesn't exist in the criminal system. Give him the opportunity- No, this is a judge question. It's not a jury question. I'm not so sure. When we have as applied challenge- He said in Williams it's a judge question. And there's little chance because the history, which I know well, the history was some independent decision maker. It was never that a jury had to decide dangerousness before giving your Second Amendment rights back. Remember? So what you have in the Constitution is a right to a jury trial on certain fundamental things. But that, this seems like, like, we indicated ATF at one point had a program, in that opinion, where ATF would make these calls. I recognize that, Your Honor. And I know that the court said that there has to be some executive or judicial determination. I don't think that the judicial determination has to be by a judge. In fact, I think the Sixth Amendment would require a jury finding because it is an integral part of the defendant's right to defend himself at that trial. And unlike- You concede, though, that there's no precedent that sets that as a standard right now. And Williams would seem to actually, even if it didn't say that outright that's not the case, I think that it probably very strongly indicated that this is a judicial decision to be made. And what I would say in response to that, Judge Davis, is that the decision is so new and the Rahimi decision that preceded it is so new that this hasn't really shaken out yet. But as we give it some thought- Here's your other problem is you didn't raise it below. And so Heller was out. You definitely could have raised these issues. Obviously, Bruin and Rahimi and others have been raising these issues. So, I mean, you're in a completely different world. I understand that, Judge Tappara. And I would just say for the sake of efficiency that this should go back to the trial court for this determination only so that this court doesn't end up wasting everybody's time going through the other issues that we raised in front of you for no reason. But let me turn to those- It's our job. It's not a waste of time. And you would be even, because you're asserting it now, you would at least be entitled to plain error review. And so the question is, given that this is such a new area, and given the Supreme Court's decision in Rahimi and then this court's decision in Williams, that you're at the least protecting your client's interests in this. It's what I'm trying to do, Your Honor. And I think it can be reviewed, as I said in the brief, it can be de novo, but more likely plain error or even ineffective assistance, which I recognize on direct appeal is not this court's usual way. But Judge Lepar and Judge Davis, you were both on the panel of the case that I cited in the 28J letter about the need to remand for intervening decisions, and I think this fits the bill perfectly. But I'd like to move on in the remaining time that I have to the other two issues. First, as to the sufficiency issue, the only evidence in the record that establishes any form of the elements of constructive possession is that the home belonged to Mr. Johnson and his wife, that he was in the home when the raid occurred, and that guns were found in two places in the home, one, in a box in a closet that contained some of his personal papers, and two, in a basement area that he and his wife both used for barbering-related purposes. And that was found by his tools, right? Excuse me? Am I right that was found by some of his barbershop tools? Yes. Yes. The thing of it is that in all of the cases the government cites, every one of them, you have no case in which there was spousal co-involvement in the marital premises and also a challenge to whether or not the weapons were really the defendant's. None of their cases addresses the issue squarely before us here. The jury decided this, right? So you can have, I mean, obviously possession can both be joint, as it is in many marriages. It obviously doesn't have to be exclusive. And the jury, the jury decided it. But the evidence in this case established not only that, well, it established that the guns were in the home in those locations, but it also established that Mr. Johnson had not been. He had been gone for the weekend. He came home on what appears to be a Tuesday night from football coach. I'm gone all the time. My stuff stays at home. Because the guns don't move, the guns can move, Your Honor. She can move them around, which she does, as he said, when he travels for her safety. Well, isn't that something that the jury took into consideration? The jury can consider it, I suppose, Your Honor, but there first has to be a Well, who are we to come behind the jury who can make all the reasonable inferences, who had the photographs of his barber stand with his clippers, all of his equipment that he uses to cut hair and trim beards and do all the things that a barber does? And if they make the inference that, hey, this is sitting right here by this stuff, by his stuff, it's not sitting on the side of the basement where she's doing hair, why would it not be reasonable for them to make an inference that this belongs to him? Because it's a bridge too far. They can infer that the guns were in the house, perhaps, at some point when he, I mean, they were in the house when he was there, but there's no evidence that places him in the same room at the same time. And if she's in control of these guns and moving them around, particularly when he's traveling, then that's not enough to get to the jury, I would argue. They have to have something more, like a text message in which he acknowledges ownership of the gun, which we have in some of the cases, or confessions that are made to other people where there is a statement that is essentially the equivalent of, yes, this gun is mine, and the only thing they have is that he allegedly invoked his Second Amendment rights at the time of the raid, which, frankly, should never be enough to suggest an inference of possession. But in any event, it doesn't matter here because they were his wife's guns that he said he was referring to. I know my time is... Was there evidence introduced as to who actually had ownership of the guns in terms of registration of the guns? The evidence was that the ownership was not to his wife, and the explanation he gave for that was that she had purchased them at a gun show. I haven't addressed the juror issue. I realize my time is up, but we would ask that you reverse the case on, remand the case for a redetermination of the Second Amendment issue, and alternatively reverse under the sufficiency analysis, Rule 29, or vacate and send back for a new trial because of the juror who was never assessed for implied bias. Thank you. Thank you. May it please the Court, Daniel Reinke on behalf of the United States. As for the constitutional claim, Judge Lepar, you pointed out, it was never raised below. In the United States v. Marlon Johnson, which was the first reported case dealing with this claim raised on plain air, given the state of the law and the circuit splits and everything that's going on, that this can't be plain air. There's been other cases since Marlon Johnson that also went along with the plain air precluding this claim. And so the claim is initially precluded by the fact that it was never raised below. But how does it, your opponent has made the argument that this should be something that should be decided perhaps by a jury, or at least there should be more evidence taken on the dangerousness of this particular individual. How do you respond to that? I think Williams and Goins, which is a recent case that came out on October 8th, and even United States v. Gales, which came out on October 10th, established that this is not a jury question. This is a judicial question that the judge decides based on the whole record, too. Not just the two categories of offenses that we have here, but also there's other offenses the judge can take into account, basically the entire record. What about his record shows dangerousness, in your opinion? The aggravated assault, the domestic violence, which was also at issue in Gales. I think Gales had a misdemeanor domestic violence conviction. That was also Rahimi, too, but having a weapon under disability in 2019, and the federal drug, I'm sorry, I think I already said that, but the federal drug conviction, and that also goes along with Goins. Goins had DUIs and possession of controlled substance, and they found that that was enough to constitutionally disarm him. Are you essentially espousing a categorical approach?  For this, Williams and other cases, we look to the specific facts. Williams actually went away from, specifically went away from a categorical approach, not just looking at elements, but looking at the actual facts of each individual case. And that's what they did in Williams, that's what they did in Goins. This court did in Goins, and this court did in Gales, and those are the three most recent cases I could find addressing this issue. As far as the constructive possession, what you need to establish is dominion and control over the weapons. And this court, I think, has a fairly clear understanding of where the guns were found. They were found next to a barber stand, where equipment was used for men's barber styling, razors, clippers, and again- Was there also hairdressing of a female nature done in the basement? According to Mr. Johnson, yes. But if you look at the picture, which is government exhibit 4A, of where the guns were found, there's nothing, like everything in there is shaving cream, razors, clippers, things that you would use to cut men's hair. The weapon that was found in the second floor bedroom was found next to Mr. Johnson's checkbook and letters addressed to Mr. Johnson. There's cases that say that that is enough. Actually, there's a number of cases that we raised where there was a spouse or a cohabitant involved. United States v. Hadley, which we cite in the brief, discovery of a weapon in a bedroom dresser in a bedroom that the defendant shared with his wife. That was enough to prove constructive possession. That's cited United States v. Bingham, which was a firearm discovered in a shared master bedroom closet. Is there a distinguishing factor here in that Mr. Johnson testified and said, correct me if I'm wrong, but said to the effect that they were not his guns? The jury heard that, and the jury heard Mr. Johnson. The jury heard the two detectives that conducted the search. The jury looked at the evidence. The jury saw photographs of where the guns were found and how they were found and what was next to them. The fact that Mr. Johnson testified differently, the jury heard that and made a credibility determination and believed the two detectives. That's a jury question that I believe the jury properly answered in this case. The issue of the juror's nondisclosure during voir dire, to establish, bias can be established two ways. Bias can be inferred or you can show actual bias. Bias can be inferred where a juror's omission was found to be intentional or extreme situations, which aren't present here, where a juror was related to someone involved in the case, worked for the prosecutor's office and didn't disclose that or had personal knowledge about the crime. That's Stevens v. Worden quoting Smith v. Phillips Supreme Court case. Do you think this is a juror misconduct case or a juror nondisclosure case? I believe it's a juror nondisclosure case, Your Honor. Is that how it was evaluated at the district court level? It was. Nondisclosure as opposed to misconduct? Yes. The juror, on the second day of, well, let me back up. During voir dire, they asked the usual questions. One of the questions was, do you know anyone in the courtroom? All the jurors responded no. The juror... And they had the AUSA stand up, right? Yes, he was right. So it wasn't like, do I know anybody in this courtroom without having somebody stand up? Mr. Patton actually asked the question. It was at page 1490 of the transcript. So Mr. Patton stands up. Does anybody know anyone in the courtroom? They say no. Trial goes on, first day, second day. At the end of the second day, juror number nine thinks, I've seen this person somewhere before, referring to Mr. Patton. And was Patton conducting the trial? Patton was second chair in the trial. AUSA Jennifer King was actually first chair. She's a newer AUSA, and Patton was kind of mentoring her through the trial. So second day, juror number nine realizes, well, I think I recognize Patton, but he's not sure. Patton or Bolt? Patton. Bob Patton. But he goes home that evening, and he realizes he might have recognized him from an annual pheasant hunt. This pheasant hunt takes place every year. It's a fairly large event. How large is this pheasant hunt? That's a problem, because no one ever said how many people are at the pheasant hunt, which I've looked and I've tried to see. The best I can see is Judge Oliver was asking questions about the pheasant hunt during the Remmer hearing, and he was told it's a large hunt, different hunt clubs get together. It's not like a small hunt where there's four or five people hunting together. It's a number of hunt clubs come together every year in Ashland County, and they hunt pheasant. There were three pheasant hunts, apparently, that are related to this case. The first pheasant hunt, Mr. Patton and juror number nine really didn't remember any interaction whatsoever. The second pheasant hunt, juror number nine remembered briefly meeting Mr. Patton. He didn't remember a handshake. He didn't remember really talking to him. He testified he didn't even talk to him. He said... Meaning the juror said that the juror didn't talk to Patton, but Patton, when he testified, Patton said, yes, we talked for 20 minutes, we had cigars, and we had beers. Right, Patton remembered differently. Patton remembered more. Patton remembered that interaction. Then at the third pheasant hunt, and Patton testified during the Remmer hearing too, they asked how you didn't recognize him, and Patton said, in the context of a trial, I never thought, I never recognized him. And Patton didn't recognize him even until the third pheasant hunt, which occurred one month after the trial had concluded, but before sentencing, when the juror, juror number nine, came up to Patton and said, oh, it's really you. I was on your trial, which kind of indicates at that point, juror number nine wasn't even 100% sure that Patton was at the pheasant hunt, or that he recognized Patton at the pheasant hunt until the third pheasant hunt. Patton then realized what was going on, notified the court the next day. Judge Oliver had the Remmer hearing. And at that hearing, he heard testimony from both juror number nine, and then he questioned Mr. Patton. Defense counsel really didn't, but the judge did, and the judge had some relevant questions. The judge noted that Patton remembered more, but the judge was more focused on what the juror remembered and whether that could show actual bias. And the judge found that the juror's memory of this was of passing a meeting at a large social event that the juror testified he placed no significance on, that the prosecutor meant nothing to him, and that he didn't believe the prosecutor was more believable because he was a pheasant hunter at the pheasant hunt, or he didn't tell anyone else on the jury that he had met the prosecutor before. And so the judge found that they had not established actual bias. As far as there's an intentional piece. The judge did not decide whether there was any implied bias. No, and that's the other piece of this. But the juror testified that there really wasn't any evidence of implied bias for the same reasons that the juror testified. There was inferred bias. He didn't find it was intentional specifically because the juror said, I was asked in the jury questionnaire, and I was asked if I knew anyone in the courtroom. And he said he never viewed, even at the Bremer hearing, that he knew Bob Patton. He said he had been with him at this event a number of times, but he didn't feel like he knew him. So it wasn't an intentional omission on his part. It's not like he said, oh, I know that guy, and I like him. I went pheasant hunting with him, and I had a beer with him. I'm not going to tell anybody, and I'm going to vote in his favor. Yeah, but there is an implication, frankly. If you've shared a beer with somebody, I would think that, you know, and a cigar and had a 20-minute conversation, that you think he's an all-around regular guy kind of thing. And so why wouldn't there be an implication that you were going to favor the prosecutor when you've had this very collegial pheasant hunting experience? Because the juror number nine didn't even remember that conversation. Jury number nine didn't remember having any conversation with him. And the fact that Mr. Patton remembered more isn't all that unusual. I mean, that happens fairly often where two people meet and say, oh, I met you at the Reds game. And they say, oh, I never remember seeing you. You know, I mean, it's just two different people's recollection of what happened. So the judge then focused on what the juror's memory was, and the juror's memory was that he didn't even remember that conversation. And the judge assumed that it happened. You know, in his order, which is record number 204, the judge assumed, at the worst, what we have here is this 20-minute conversation, having a cigar. Well, you have to assume that the AUSA, who has a detailed memory, has a correct memory. I mean, it would be very strange not to believe that the more specific memory is the correct one. Right. But the judge focused on the fact that the juror, that had so little effect on the juror, that the juror number nine didn't even remember it. The fact that Patton remembered it, okay, let's assume that happened. But that meant so little to juror number nine that he didn't even remember that it happened. His memory of it was, I was just at this pheasant hunting event with the prosecutor, which he didn't himself realize until he thought he, you know, the realization came to him on the second day of trial. But he didn't know even for sure until actually the third pheasant hunt. Which was after the trial. Which was one month after trial. So if there are no further questions, I would ask that this court affirm the judgment of the district court. Thank you. Thank you. Two quick points, your honors, on rebuttal. First on the sufficiency question. Yes, the government did cite some cases in which firearms were found in marital homes in what are commonly considered marital joint spaces like master bedrooms. But in every such case, there was nothing, nothing in the record to suggest that it was not also the defendant's gun. Whosever it was. Here we have a very different scenario. We have a very clear explanation. And so, yes, that explanation comes from the defendant. And it comes in his case. So it's not technically considered for sufficiency. But it would be absurd in a case where there are two equally plausible explanations. One is that he worked side by side with the guns. Or that he put the gun in the closet with his papers. The other is that his wife did both of those things. But isn't that a jury question, really? Not if it's 50-50, your honor. There's no explanation. How do you decide is it 50-50 or 49-51? Well, in most of the cases, there's something more that helps you figure that out. And here we don't have it. Well, the documents in the upstairs bedroom. Doesn't mean that he put the gun there. But aren't we required to give all reasonable inferences to the actual jurors' verdict? Reasonable inferences, your honor. I didn't hear you. Reasonable inferences. You're saying it's unreasonable to infer from where the guns are found that it's his? What if it was found in his sock drawer? And if it was his sock drawer, then it would be different. Okay, so it's this picture that the government points to. It's found by all men's hair supplies. In a shared space. But if I may, I don't want to lose. And I appreciate your zealously, but the zealous nature. But the other one's found by his papers. And so, I mean, so socks, yes. Papers and hair supplies, no. That's what we're parsing here. Well, because I think marital couples tend to share papers more than they share clothing. But let me move quickly on, if I may have an extra 30 seconds, to the jury issue. Because the one thing that really drives this question is whether Juror 9 intentionally failed to disclose his awareness of a possible connection. And he did. As Mr. Ranke suggested, he realized the second day of the trial that he knew or had some memory of the prosecutor. And so by not disclosing it then, it was an intentional decision to keep it from coming out. And because of that, there is a required implied bias analysis that Judge Oliver simply didn't do. But did the attorney ask for that implied bias analysis? I know you weren't the lawyer at the trial level. I don't recall seeing a specific request for that, Your Honor. But because the standard requires the court to evaluate both actual and implied, I don't know that one needs to specifically request it for the motion for new trial to trigger that analysis. I thought he asked for a completely different thing below. Maybe I'm looking at the wrong motion. But I thought he asked for a completely different thing below. And so wouldn't we review this under invited error? I mean, I would have to – I don't have an answer for that question, Your Honor, off the top of my head. But I can certainly tell you that the analysis that the judge undertook touched on the very cases, Remmer and so forth. But he did the analysis, as I understand it, that the attorney asked for. And so I thought, am I mixing this up? Did he ask for misconduct? There may be some confusion about that in the record, Your Honor. But I guess I would say that the government hasn't raised anything like that in defense in its brief. And so we ask that the court decide the case based on the issues that the parties have briefed here. And if you send it back for a new trial on that basis, that would also give Mr. Johnson the opportunity on new trial to make the arguments about whether the jury should consider his dangerousness and so forth. So it would sort of be a tidy way to wrap up the whole thing. Do defendants really want juries hearing everything? I mean, that's the whole point of old chief. Defendants are going to put assaults and drug convictions? The point of old chief, Your Honor, is that it's the defendant's choice. And this choice was never given to this defendant. So we ask that the court reverse or the alternative. Then you're going to have to stipulate he's dangerous. That's really what you want in front of a jury? I don't know that we would stipulate that he's dangerous. I get it. But some defendants, you're going to have murders in their background. They're going to have to stipulate because the government's entitled to pre-judge. Well, the jury doesn't have to hear the stipulation, Your Honor. That can be kept from them. I don't know. The dangerous nature would be stipulated. Right. But if you want to stipulate to dangerousness, if that's your choice as a defendant and you do it, then the jury doesn't hear why. Okay. Thank you. Thank you. Thank you both for your argument. And, Mr. Polis, we know that you're representing under the Criminal Justice Act, and you're part of the Case Western Reserve Law School program, and the students were part of the briefing process, and we thank you for your work in that regard, and thank you for the work, Mr. Ranke, that you do as an AUSA. So the case will be submitted. It's an interesting case, and the clerk may call the next case.